In re Estate of LOUIS S. CASS.

BEN H. HAZELTINE et al., Appellants, v. FRANCES CLARA CASS et al., Executrices, Appellees.

No. 44989.

MAY 7, 1940.

REHEARING DENIED SEPTEMBER 27, 1940.

Don Barnes and Pike, Sias, Zimmerman & Butler, for appellants.

George D. Harris and Swisher, Swisher & Cohrt, for appellees.

MILLER, J.—This is an action in probate to establish a claim against the estate of Louis S. Cass, deceased, who died December 3, 1933. His will was admitted to probate. Appellees were appointed executrices of his estate January 4, 1934, and notice of such appointment was published January 23, 1934.

On August 28, 1934, appellants filed a claim against the estate for the sum of $465,000, claimed to be due on account of facts set forth in the petition in the case of Ben Hazeltine et al. v. Frances Clara Cass et al., in the district court of Black

Hawk county, Iowa, copy of which petition was attached to the claim and incorporated therein by reference.

The petition upon which the claim was based is a petition in equity asserting the following facts. The suit was a class suit for the benefit of all parties, individuals, partnerships and corporations having a common or general interest with the plaintiffs. The Waterloo, Cedar Falls & Northern Railway Company is an Iowa corporation and the decedent, Louis S. Cass, together with his brothers, C. D. Cass and J. F. Cass, were the only directors of such railway company during the times material herein. In 1912, the three Casses organized the Cedar Valley Railway Construction Company as a Delaware corporation. It was, in fact, only a subsidiary of the Waterloo, Cedar Falls & Northern Railway Company, as the stock of both corporations was owned or controlled by the Casses. The officers and directors of the construction company were merely nominal officers, being controlled by the Casses. In 1912, the railway company was authorized to issue preferred stock and issued such stock in the total amount of $1,538,000, of which $700,000 was sold to the public and the plaintiffs own or control $465,000 thereof. There was issued to the construction company $789,000 of preferred stock, $225,000 thereof was exchanged for common stock in the railway company. The articles provided that the preferred stock could be retired at $103 per share on 60-day notice to the stockholders. The stock issued to the construction company was issued without consideration and for the purpose of having the Casses' stock retired to the exclusion of the other stockholders. Notice was given to the construction company and 5,797½ shares of preferred stock issued to the construction company was retired at $103 per share. No notice was given to the other preferred stockholders. The construction company was dissolved. Plaintiffs did not discover the facts until six months before the claim was filed. The Cass brothers acted fraudulently, in bad faith and in breach of duty to the plaintiffs. The other shares of preferred stock were rendered worthless because the funds of the railway company available to retire preferred stock were exhausted by the retirement of the

construction company's stock. The prayer of the petition was that the executrices of the estate account to plaintiffs for the money received on account of the preferred stock, that a trust be established as to such funds, plaintiffs be paid their equitable portion thereof, a claim be established against the estate therefor and for general equitable relief.

In the latter part of 1936, the petition was thrice amended by adding other allegations, to wit: Purported contracts were entered into between the railway company and the construction company for the purpose of constructing certain railroad lines between Waterloo and Cedar Rapids, Iowa. Large sums of money were paid in excess of $1,000,000. The same person was engineer for both companies. The Casses controlled the operations of both corporations. Demand on the railway company to prosecute the action would be useless because C. D. Cass is still a director and a dominating influence, and other litigation of the same character has been resisted by attorneys who are directors or counsel for the railway company. The facts in reference to the matters complained of could not be discovered by examination of the books of the railway company alone. It was necessary to have access also to the books of the construction company. The latter had been destroyed or had been concealed from plaintiffs and only after access to such books as still remain did plaintiffs have sufficient evidence to predicate this action.

Appellees filed an amended and substituted denial of the claim and answer to appellants' claim, as amended. The defenses asserted were the following: A general denial; plaintiffs knew or were bound to know of the action of the stockholders of the railway company, could have ascertained the same, had access to the books of the railway company, have been guilty of laches and are estopped to claim lack of knowledge at this time; plaintiffs are not the real parties in interest and have no right to maintain the claim; the claim is barred by the statute of limitations; the suit in equity, referred to in the claim, has been dismissed and the dismissal of such suit

constituted a dismissal of the claim; the amendments to the claim filed in 1936 assert new causes of action which are barred by section 11972 of the Code. The prayer of the answer was that the claim be dismissed.

The cause proceeded to trial before the court without a jury. At the outset, a dispute arose whether the proceedings were at law or in equity. The court at first assumed the position that, since the proceedings were in probate to establish a claim against an estate, they were ordinary proceedings to be tried as an action at law. Appellants contended that the allegations of the claim presented equitable issues and, accordingly, the proceedings should be considered in equity. The matter appears to have been argued at length, but no definite ruling made. In the course of the trial, the court overruled quite a number of objections to the introduction of evidence. However, we do not find that any objections were sustained nor that any evidence was excluded. In those instances where the objections were not overruled, the evidence was admitted subject to the objection so that the evidence was preserved in the same manner as though the case had been tried in equity.

Certain facts appear to have been established without serious dispute. The plaintiffs' evidence shows that in 1912 the three Cass brothers, C. D., J. F., and L. S. Cass, were the only directors of the Waterloo, Cedar Falls & Northern Railway Company, which will be referred to as the railway company. In that year, the Cedar Valley Railway Construction Company was organized as a Delaware corporation. It will be referred to as the construction company. The construction company issued stock in the amount of $200,000. The consideration paid for the stock was a note of L. S. Cass for $1,200 and $200,000 of stock in the railway company owned by the Cass brothers. When the company was organized, the Cass brothers did not appear as stockholders nor as officers of the construction company. With the exception of the resident director in the state of Delaware, the officers, directors and stockholders of the construction company were stockholders or employees of the rail-

way company. The chief engineer of the railway company was a director and engineer of the construction company. The general counsel of the construction company was secretary and attorney for the railway company. The offices of the two corporations were in the same building in Waterloo. The railway company let contracts to the construction company for the construction of a railroad line from Waterloo to Cedar Rapids and also for construction work in Waterloo. These contracts amounted to several million dollars. Some of the contracts were in writing and carefully prepared. Other contracts, involving substantial sums, were made orally and later ratified. The only work done by the construction company was for the railway company. The books of the construction company could not be examined by a stockholder owning less than 1,000 shares, unless he was a director or the examination was authorized by the board of directors.

Appellants contend that the facts, above reviewed, constituted suspicious circumstances which should be considered as a badge of fraud. Appellees undertook to offset such circumstances by evidence which is not seriously controverted, establishing the followings facts. The three Cass brothers put into the construction company stock of the railway company of the par value of $200,000, and worth that amount. When the construction company was liquidated in 1921, they received, as liquidating dividends, collateral held by the construction company of the par value of $146,177.47, which represented a net loss of approximately $54,000. During the time the construction company was operated, the Casses received no dividends on their stock and received no salaries from the company. It was customary for a railroad to organize a construction company to do its construction work or let it to an independent contractor. This was due in part to requirements of the interstate commerce commission in accounting matters. If the railroad did its own construction work, accounting problems arose in determining whether the charges should be made to capital account or operating account, whether they were for maintenance and operation or were construction items. By

organizing the construction company and making contracts with the construction company, the amounts paid to the construction company were readily ascertained as construction items and differentiated from maintenance or operating expenses. Another reason for the organization of the construction company was that it was easier to finance the work in that manner. The money was raised by the issuance of general mortgage bonds. Under the trust deed, the bonds could be issued only when the earnings of the railroad were one and one-half times the interest on the bonds outstanding, and this was at times a handicap. The foregoing testimony was given by C. D. Cass, who also denied that there was any intention in the organization of the construction company to create any preference over preferred stockholders of the railway company.

The evidence, upon which plaintiffs rely to establish their contentions that preferred stock issued to the construction company was retired in such a manner as to create a preference over other preferred stockholders, consisted of the testimony of J. B. Knowles, who was secretary, treasurer and auditor for the railway company, and the records of the railway company which were identified by him. On this proposition, after testifying that the accounts payable, due from the railway company to the construction company for building the railroad, were paid, he testified as follows:

"Q. I will ask you Mr. Knowles, whether or not by reference to a Journal Voucher No. 6383, and 6413, the preferred stock held by the Cedar Valley Construction Co. in the Waterloo Cedar Falls & Northern Railway Co. was thereby retired and cancelled? A. Yes it was.

"Q. And that was on or about December 31, 1917? A. Yes, sometime in the month of December, 1917.

"Q. And the face amount of that preferred stock was how much, retired, that was retired in December, 1917? A. Our journal entry 6383 was $106,000, and on Journal 6413, it is $473,750.

"Q. $473,750. A. Yes. Q. That makes total of $579,750?
A. Yes sir."

It will be noted that the foregoing testimony depends upon the record shown by vouchers 6383 and 6413. In connection with these two vouchers, consideration must also be given to voucher No. 10664. In regard to the latter voucher, we find the following testimony of Knowles:

"Q. Referring to—examine Exhibit 'H-1' with particular reference to Voucher 10664, do you know whether or not the preferred stock or general mortgage bonds, or any of this collateral that is represented here or anything that it may have been converted into, was repurchased by the railway company, or whether or not that collateral or anything that it had been exchanged for, was merely surrendered upon the payment of the final payment of the voucher? * * * A. The collateral security of Eight hundred eighty-three thousand dollars and forty-eight thousand, was exchanged later for preferred stock, common stock and notes, when the railway company made their payments to the construction company for building the railroad, this collateral security in the form of the preferred stock was returned to the railway, which was nothing more or less than the return of the collateral security upon payment of indebtedness."

Voucher No. 6383 referred to preferred stock of $106,000 and contained the following notation:

"The Railway Company reassumes Notes taken over by CV Ry Construction Co. and gets possession of Preferred Stock put up as collateral."

Voucher No. 6413 referred to preferred stock amounting to $473,750, together with items of general mortgage bonds and common stock. On this voucher, which is initialed by Knowles, appeared the following notation:

"General Mortgage Bonds from the Cedar Valley Ry.

Construction Co., as per Contract. For part payment on the purchase price, the Railway Company assumes the above bills payable. The collateral security is held by the Cedar Valley Ry. Construction Co., as a guarantee that payment on the above Note will be made by the Railway Company. The collateral security will be returned by the Construction Co., as fast as the Notes are paid and taken up by the Railway Co. Dictated by LSC.''

There was other evidence to substantiate Knowles' testimony that the preferred stock had been transferred to the construction company merely as collateral security for obligations due the construction company from the railroad company under the construction contracts and that such preferred stock was merely surrendered to the railway company when the contracts were paid by it or otherwise secured. We find no evidence in the record that notice was ever given the construction company that preferred stock held by it was to be retired at $103 per share.

While there were some records of the construction company identified and introduced in evidence, practically all of the record evidence introduced at the trial was secured from the railway company and, from our examination of the evidence, the transactions between the construction company and the railway company were all shown by the books of the railway company. The evidence shows that at no time was any demand made upon the railway company by the plaintiffs or their representatives or attorneys for an examination of their books and records until after the claim was filed, and, when request was made for such examination, the examination was permitted.

The books and records of the construction company, after its dissolution in 1921, were stored with the Iowa Warehouse Company in Waterloo. Under the Delaware law, these could be destroyed at the end of three years after the dissolution of the corporation. Robert B. Cass, vice-president of the Iowa Ware-

house Company, testified that the records were not destroyed until 1932, 11 years after the dissolution of the company.

The court found generally for the defendants and dismissed the claim. Claimants have appealed to this court.

The first two assignments of error assert that the court erred in treating the proceedings as ordinary proceedings and in not holding that they were equitable proceedings. It is unnecessary to determine that question because it would not affect the result of this appeal.

■ Appellants' third assignment of error asserts that the Cass brothers were guilty of various manipulated transactions in exchange of capital stock between the two corporations, which resulted in rendering the claimants' stock worthless by reason of wrongful conversion of railway funds by the Cass brothers, and, accordingly, claimants are entitled to an accounting from the estate for the sums so wrongfully received by such conspirators. We are disposed to the view that the evidence as a whole fails to establish such contentions of appellants. As far as the alleged redemption of the preferred stock is concerned, we are disposed to the view that the transactions merely consisted of the pledging of preferred stock as collateral security for obligations owed by the railway company to the construction company and the redemption of such collateral by the railway company from the construction company.

■ In any event, the transactions of which appellants complain were all shown by the books and records of the railway company. Appellants, as stockholders of the railway company, had access to such books and records. Access to such records was never denied them. Appellants were not stockholders of the construction company. The limitation as to examination of its books and records by its stockholders had no application to appellants. The books and records were kept in Waterloo for over 10 years after the dissolution of the construction company. Had any legal proceedings been instituted, the statutes of this state would have afforded a means for examination of such books and records by appellants. All of the transactions

occurred over 12 years prior to the filing of this claim. The defense of the statute of limitations was raised by the answer and asserted at the trial. Appellants have failed to establish any grounds for avoiding the effect of the statute. Hence, the court was clearly right in dismissing the claim.

Other propositions are argued in the briefs, but, by reason of the foregoing pronouncement, it is unnecessary for us to discuss or decide them. The judgment is affirmed.—Affirmed.

CHIEF JUSTICE and all JUSTICES concur.